IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


JAMES E. WALLO,

                Plaintiff,

      v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.

No. CV 08-6060-MO

OPINION AND ORDER


**MOSMAN, J.,**

        Plaintiff James Wallo seeks judicial review of the final decision of the Commissioner of

the Social Security Administration finding him not disabled and denying him application for

Social Security disability insurance ("SSDI") benefits under Title II of the Social Security Act.

        This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C.

§ 405(g).  In his appeal, Mr. Wallo claims that the Administrative Law Judge ("ALJ") failed to

consider the limitations in the lifting requirements in his residual functional capacity ("RFC"),


PAGE 1 - OPINION AND ORDER

and the extent of his mental limitations and other symptoms.  In evaluating Mr. Wallo's mental

and nonmental impairments, I find that the ALJ's decision is properly based on legal standards

and that his findings are supported by substantial evidence in the record as a whole.  Therefore, I

AFFIRM the final decision of the Commissioner.

## BACKGROUND

Mr. Wallo filed his application for SSDI on August 2, 2005.  (A.R. 25.)[1]  He alleges

disability since January 1, 2003, due to hepatitis C, fibromyalgia, arthritis, Attention Deficit

Disorder ("ADD"), neck and back problems, memory problems, alcoholism, carpal tunnel

syndrome, and depression.  (A.R. 14, 16.)  The application was denied initially and on

reconsideration.  (A.R. 34, 41.)  The ALJ held a hearing on August 22, 2007. (A.R. 14.)  At the

hearing, Mr. Wallo was represented by an attorney.  (A.R. 14.)  Mr. Wallo, his wife, and

vocational expert ("VE") Nancy E. Bloom testified at the hearing.  (A.R. 14.)  At the time of the

hearing, Mr. Wallo was a 48-year-old married man, living with his wife and children.  (A.R. 382,

179.)  He graduated from high school, where he received B and C grades, and was not enrolled in

special education.  (A.R. 178.)  Mr. Wallo completed one year of college.  (A.R. 382-83.)  He has

worked as a mill worker, driver, cabinet builder, and logger.  (A.R. 74.)

The ALJ issued a decision on November 17, 2007, in which he found that Mr. Wallo was

not entitled to receive benefits.  (A.R. 25.)  That decision became the final decision of the

Commissioner on January 10, 2008, when the Appeals Council denied Mr. Wallo's request for

review.  (A.R. 5.)  This appeal followed.

---

[1] Citations "A.R." refer to indicated pages in the official transcript of the administrative record filed on July 15, 2008 (#11).

PAGE 2 - OPINION AND ORDER

## DISCUSSION

### I.      Standard

The initial burden of proof rests on a claimant to establish disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). The claimant must demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner must conduct a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520. A district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the "evidence is susceptible to more than one rational interpretation," one of which supports the Commissioner's final decision, the district court must uphold the Commissioner's decision. *Andrews*, 53 F.3d at 1039-40; *Batson*, 359 F.3d at 1193; *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

### II.      The ALJ's Decision

For the purposes of  discussion, the ALJ found that Mr. Wallo had not engaged in substantial gainful activity since January 1, 2003. (A.R. 16.) He found that the following

impairments, in combination, are severe: hepatitis C, arthralgias from hepatitis C, depression,

anxiety, and alcohol use. (A.R. 16.) The ALJ found that these impairments, or the combination

thereof, did not meet or equal a disorder listed in the Commissioner's regulations, and assessed

Mr. Wallo's RFC as follows:

> [The] claimant has the residual functional capacity to perform light work. "Light
> exertion work" involves lifting no more than 20 pounds at a time with frequent
> lifting or carrying of objects weighing up to 10 pounds. He is able to sit, stand
> and/or walk about six hours each in an eight-hour workday. He is able to
> frequently balance, and climb ramps and stairs. He is limited to occasionally
> climbing ladders, ropes or scaffolds. He is restricted to occasionally stoop, kneel,
> crouch and crawl. He has no manipulative, visual, communicative or
> environmental limitations. These physical limitations are given in consideration
> of his physical impairments, including hepatitis C and arthralgias. Because of his
> mental impairments, severe and nonsevere, he is also restricted to simple, routine,
> repetitive work, and to minimal general public contact.

(A.R. 19.) The ALJ applied these findings to his analysis.

The ALJ found that Mr. Wallo could no longer perform his past relevant work at step

four. (A.R. 23-24.) At step five, the ALJ found that Mr. Wallo could perform jobs that exist in

significant numbers in the national economy. (A.R. 24.) Therefore, the ALJ found Mr. Wallo

not disabled since January 1, 2003, and ineligible for SSDI benefits. (A.R. 25.)

Mr. Wallo disputes that the ALJ's decision is not supported by substantial evidence

because the lifting requirement of the RFC does not exactly match the hypothetical presented to

the VE. (Pl.'s Br. (#12) 5.) He also argues that the ALJ erred as a matter of law because the ALJ

did not properly consider his depression, anxiety, ADD, fatigue, foot pain, and pain unrelated to

hepatitis C. (*Id.* at 7-12.) Therefore, Mr. Wallo argues the ALJ's decision is not supported by

substantial evidence because it does not consider all of his impairments. (*Id.* at 12-13.)

PAGE 4 - OPINION AND ORDER

III.    **Analysis**

    A.  *Lifting Requirement in the RFC and the Hypothetical*

Mr. Wallo contests that the ALJ erred in his finding because the hypothetical posed to the

VE did not adequately reflect the RFC finding.  Specifically, Mr. Wallo argues that the "lifting"

functional limitation the ALJ presented to the VE is different and is broader in scope than the

ALJ's finding in Mr. Wallo's RFC.

    For the hypothetical, the ALJ asked the VE to assume the following:

> [A]n individual age 43 at onset, education high school plus a year of college and the
> experience as indicated by you.  The State Disability Determination Services made an
> assessment in this case that the individual could perform at a *light residual functional
> capacity occasionally lifting 20 pounds, frequently 10*, sitting, standing, and walking
> approximately six hours in an eight-hour day, pushing and pulling unlimited
> commensurate therewith.  Postural activities to include frequent stairs, balancing, and the
> rest of the activities at the occasional level.  No other limitations.  Mental limitations to
> include minimal general public contact.

(A.R. 415) (emphasis added).

    The VE then provided three examples of work with light exertion levels which a person

fitting the hypothetical described above could do.  (A.R. 416.)  The jobs include small products

assembler, office helper, and packing line worker.  (A.R. 416.)  The VE further testified that

these positions are consistent with the Dictionary of Occupational Titles (DOT).  (A.R. 416.)

    In his decision, the ALJ defined "[l]ight exertion work" as "lifting no more than 20

pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  (A.R.

19.)  The DOT defines light work, in part, as "[e]xerting up to 20 pounds of force occasionally,

and/or up to 10 pounds of force frequently, and/or negligible amount of force constantly."[2]

---

    [2] Dictionary of Occupational Titles (4th ed.) App. C, *available at*
http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM

Mr. Wallo asserts that "occasionally lifting 20 pounds, frequently 10 . . ." is not the same as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  ((Pl.'s Br. (#12) 5; A.R. 19, 415.)  As such, Mr. Wallo argues the ALJ's decision is not supported by substantial evidence and the ALJ must explain the deviation from the DOT.

Although it may be true that an individual who can lift "no more than 20 pounds at a time" is more restricted than an individual who can "occasionally lift 20 pounds," I find the two phrases to be functionally the same.  I base this analysis on the fact that "[t]he hypothetical need not frame the claimant's impairments in the specific diagnostic terms used in the medical reports, but instead should capture the 'concrete consequences' of those impairments."  *England v. Astrue*, 490 F.3d 1017, 1023 (8th Cir. 2007) (quoting *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006)).  While it may have been ideal for the ALJ to use verbatim language from the RFC in posing his hypothetical, it is clear that the 'concrete consequences' for both phrasing is identical, namely that Mr. Wallo can occasionally lift up to 20 pounds.

Even if the phrasing of the hypothetical was functionally different from the RFC finding, Mr. Wallo still falls under the "lifting" restrictions in the hypothetical presented to the VE.  Mr. Wallo stated in his Function Report-Adult that he "can lift 20 lbs."  (A.R. 22, 114.)  If either phrasing of the lifting restriction was more accurate than the other, it would be the hypothetical presented to the VE.  Because the VE based her evaluation of available work on the hypothetical, her valuation is the correct one.  And because the ALJ relied on the work identified by the VE, as Mr. Wallo asserted in his brief, the ALJ's reliance is also correct and thus supported by substantial evidence.  *See also Bayliss v. Barnhart*, 427 F.3d 1211, 1217-18 (9th Cir. 2005)

(ALJ's reliance on VE's testimony was proper because hypothetical contained all of the limitations ALJ found credible).

Finally, Mr. Wallo contends that the ALJ has a duty to explain any deviations from the DOT. (Pl.'s Br. (#12) 6.) Here, Mr. Wallo misreads *Massachi v. Apfel*, 486 F.3d 1149 (9th Cir. 2007). The *Massachi* court held that an ALJ may rely on expert testimony which contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation. *Massachi,* 486 F.3d at 1153 (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995)). The *Massachi* holding does not apply to the present case because the VE's testimony did not contradict the DOT. And because the VE stated that her testimony did not deviate from the DOT, the ALJ need not proceed to the second inquiry of whether there is reasonable explanation for any deviation as suggested by the *Massachi* court. In the absence of any conflicts between the VE's testimony and the DOT, the ALJ has no affirmative duty to explain any deviation.

## B. *The ALJ Properly Considered Mr. Wallo's Mental Limitations*

### 1. **Depression and Anxiety**

Mr. Wallo claims that the ALJ erred as a matter of law because the RFC did not properly consider his depression and anxiety. (Pl.'s Br. (#12) 7.) Mr. Wallo alleges that Dr. Maribeth Kallemeyn did not review all of Mr. Wallo's medical records in order to determine the severity of his depression. (Pl.'s Br. (#12) 8.) Instead, Dr. Kallemeyn only reviewed the records of Ms. Arvilla Claussen, RN, MS, and therefore, Dr. Kallemeyn's opinion is not supported by substantial evidence. (Pl.'s Br. (#12) 8.) Mr. Wallo also claims that because the state agency examiner, Dr. Bill Hennings, relied on the opinion of Dr. Kallemeyn, his opinion is also unsupported by substantial evidence. As such, Mr. Wallo now claims that the RFC is invalid because the ALJ

relied on Drs. Kallemeyn's and Hennings' records, and did not provide functional limitations for Mr. Wallo's depression and anxiety.

I disagree.  First, Mr. Wallo does not provide any support for the proposition that an examining physician must review a certain number of records, or that examining physician's findings are held to a "substantial evidence" standard.  Second, I find that both Drs. Kallemeyn and Hennings properly evaluated Mr. Wallo for depression and anxiety by examining the claimant themselves and taking extensive notes.  For example, Dr. Kallemeyn incorporated Mr. Wallo's depression and anxiety in her report under the section titled "Identifying Information, Reason for Referral, and Sources of Information."  (A.R. 178.)  Dr. Kallemeyn noted "[s]pecific points to be covered in this report include depression and anxiety."  (A.R. 178.)  Dr. Kallemeyn did not ignore Mr. Wallo's depression; on the contrary, she noted it several times in her report.  (A.R. 178, 180, 181, 183.)  Mr. Wallo also stated that he will continue taking his current medicine, Wellbutrin, "because it helps him control his anger."  (A.R. 181.)  Dr. Kallemeyn diagnosed Mr. Wallo with anxiety disorder, not otherwise specified (NOS).  (A.R. 183.)  Similarly, Dr. Hennings also addressed Mr. Wallo's depression and anxiety.  Dr. Hennings diagnosed Mr. Wallo with anxiety-related disorders, but not depression because Mr. Wallo did not meet any of the depressive syndromes.  (A.R. 189, 192.)

The ALJ must consider all of the medical evidence and is responsible in resolving conflicts in the medical evidence.  20 C.F.R. § 416.929; *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).  While it is clear that Mr. Wallo had, and may possibly continue to suffer from some level of depression, there is substantial medical evidence supporting the ALJ's conclusions.  For example, on July 14, 2006, Mr. Wallo stated to Dr. Erik Blake that he did not

feel that depression was much of a problem for him, but that his main complaint is being restricted from doing the activities he would like to perform due to pain. (A.R. 22).

Further, the ALJ did not fail to consider Mr. Wallo's depression and anxiety disorder because he did not rely on Drs. Kallemeyn's and Hennings' reports alone. (A.R. 23.) The ALJ considered Mr. Wallo's severe and nonsevere mental impairments when concluding that Mr. Wallo's residual functional capacity is "restricted to simple, routine, repetitive work, and to minimal general contact." (A.R. 19, 307.) Thus, the ALJ properly relied on substantial evidence in reaching the RFC conclusion.

### 2. Effect of Stress on Mr. Wallo's Attention Deficit Disorder ("ADD")

Mr. Wallo claims that the ALJ's decision regarding his ADD is "internally inconsistent, arbitrary and capricious" because the ALJ failed to identify the limitations of stress and/or reduced productivity on his ADD. (Pl.'s Br. (#12) 8.) I find that not only did the ALJ address Mr. Wallo's ADD and incorporated its limitations in his RFC, but that the ALJ also properly concluded that the functional limitations of stress and/or reduced productivity were not severe.

First, there is substantial evidence supporting the ALJ's finding that Mr. Wallo's ADD was, at most, mildly limiting. Nonetheless, the ALJ incorporated the functional limitations into his RFC. In 2002, Mr. Wallo was diagnosed with ADD, inattentive type by Ms. Claussen, who also prescribed Adderall, a medication used to treat ADD. (A.R. 17, 145-49.) Ms. Claussen continued to prescribe Adderall to Mr. Wallo until March 21, 2003, when the treatment apparently ended. (A.R. 146.) Ms. Claussen noted that Mr. Wallo was expected to return after that date once his health insurance was "back in order." (A.R. 146.) Subsequently, Mr. Wallo discontinued his medication for ADD. During his Psychodiagnostic Interview with Dr.

PAGE 9 - OPINION AND ORDER

Kalleymeyn on November 15, 2005, Mr. Wallo stated that he had stopped taking Adderall

"because he did not like it and it did not help his symptoms." (A.R. 17, 180.) There is no

indication in the records as to when Mr. Wallo may have stopped taking Adderall, but that he

did.

Further, between March 21, 2003, and November 15, 2003, the records are devoid of any

mention or treatment of Mr. Wallo's ADD. As the ALJ noted, there were no references about

Mr. Wallo's continued treatment for his ADD since his alleged onset date through the hearing.

(A.R. 17.) The absence of records of Mr. Wallo's ADD and the discontinuation of his treatment

of his ADD after March 21, 2003, suggests that his ADD is not at the forefront of his medical

concerns, or at the very least, it is not a primary concern. (A.R. 17.)

Moreover, two different examining physicians did not find evidence of ADD during their

evaluation of Mr. Wallo. The ALJ noted that Dr. Kallemeyn "did not find evidence for [the

ADD] disorder in her evaluation" of Mr. Wallo. (A.R. 17, 183.) Dr. Kallemeyn also noted that

Mr. Wallo would not have "serious difficulty attending to, concentrating on, or remembering

instructions or tasks in a potential work setting." (A.R. 23.) The lack of difficulty in maintaining

concentration was echoed by Dr. Hennings, who performed a psychological evaluation of Mr.

Wallo. Dr. Hennings only found Mr. Wallo to suffer from "mild difficulties in maintaining

concentration, persistence or pace," but noted that these limitations did not rise to the level of a

mental impairment. (A.R. 17-19.) Relying on Drs. Kalleymeyn's and Hennings's psychological

evaluations, the ALJ concluded that Mr. Wallo's mental limitations were not severe enough to

qualify him for disability benefits at steps two or three. (A.R. 17-19.)

The fact that a medical problem is not at the forefront of Mr. Wallo's complaints and that

Mr. Wallo voluntarily discontinued his treatment does not necessarily mean that his disorder has

ceased to exist.  Assuming that Mr. Wallo continues to experience ADD  before or since his

diagnosis in June 2002, the ALJ took this limitation into consideration by giving Mr. Wallo "the

benefit of the doubt," and limiting his RFC to "simple, routine, repetitive work, and to minimal

general public contact."  (A.R. 17-19, 23.)  For these reasons, the ALJ's decision regarding Mr.

Wallo's ADD and its resulting limitations in his RFC is supported by substantial evidence.

Second, the ALJ properly concluded that Mr. Wallo's stress and/or reduced productivity

related to his ADD are not severe.  Mr. Wallo claims that "[t]he ALJ did not include any

functional limitations in the residual functional capacity related to stress and/or reduced

productivity" based on Ms. Claussen's memo dated January 22, 2003.  (Pl.'s Br. (#12) 9.)

Addressing Mr. Wallo, Ms. Claussen's memo state, in part:

> You have noted and I have confirmed that your productivity decreases with stress,
> pressure, high demands for time, and some kinds of deadlines.  Loss of productivity is
> particularly reduced in tasks that require concentrated thought rather than concentrated
> effort or physical activity.  In addition, you continue to experience mood fluctuations and
> modest depression, which also affect your productivity and internal resources for stress
> management.

(A.R. 145.)

The ALJ referenced Ms. Claussen's memo when considering the effects of stress and/or

reduced productivity, in combination with Mr. Wallo's ADD.  (A.R. 17.)  However, the ALJ also

noted Dr. Kallemeyn's finding that Mr. Wallo would not have "serious difficulty attending to,

concentrating on, or remember instructions or tasks in a potential work setting."  (A.R. 23, 145.)

In regards to his "mood fluctuations," as identified by Ms. Claussen, Dr. Hennings found that his

"reported angry outbursts could potentially interfere with appropriate social interactions," and

PAGE 11 - OPINION AND ORDER

therefore, recommended "minimal general public contact." (A.R. 23, 145.) While not severe, the

ALJ incorporated the combined mental limitations in the RFC by limiting his work to "simple,

routine, repetitive work, and to minimal general public contact." (A.R. 19.) In short, the ALJ

has properly evaluated and incorporated the limitations of stress and/or reduced productivity in

combination with Mr. Wallo's ADD in his decision and RFC.

## C.  The ALJ Properly Considered Mr. Wallo's Physical Limitations

### 1.  Fatigue

Mr. Wallo claims the ALJ failed to properly address his fatigue. But a claimant of social

security disability benefits must follow the treatment prescribed by his or her physician if the

treatment can restore the claimant's ability to work. 20 C.F.R. § 416.930(a). If a claimant does

not follow a prescribed treatment absent an acceptable reason, then that claimant is not disabled.

*Id.* at (b). Some of these acceptable reasons include the treatment being contrary to a claimant's

religion, the enormity of the treatment (e.g. open heart surgery), and the amputation of an

extremity. *Id.* at (c).

In the present case, it is not disputed that Mr. Wallo's fatigue is directly related to his

hepatitis C. (Pl.'s Br. (#12) 9-10.) The ALJ found that Mr. Wallo has declined treatment for his

hepatitis C due to his continued use of alcohol. (A.R. 16-17, 21, 23.) The ALJ could have

denied Mr. Wallo disability benefits based on his continued use of alcohol, after being directed

not to by several physicians. *Thompson v. Flemming*, 188 F. Supp. 123, 125 (D. Or. 1960)

(disability denied because claimant has not adhere to his diabetic diet and has continued to drink

excessive amounts of alcohol despite physicians' prohibitions); *see also  Jackson v. Sec'y of*

*Health, Ed. and Welfare*, 319 F. Supp. 385, 389 (D. Ohio 1970) (claimant willfully aggravated

his impairment by indulging in smoking and drinking and by refusing prescribed treatment).

However, the ALJ nonetheless considered Mr. Wallo's hepatitis C as a severe impairment and

accounted for his hepatitis C when considering his physical limitations.  (A.R. 16, 19.)

Mr. Wallo now claims that the ALJ's failure to identify any functional limitations related

to his fatigue as a result of  hepatitis C is a legal error.  (Pl.'s Br. (#12) 9-10.)   Because a

claimant's symptoms can sometimes suggest a greater level of severity of impairment that can be

shown by objective medical evidence alone, the ALJ must consider other factors when assessing

the credibility of the claimant's statements regarding his symptoms.  20 C.F.R. § 404.1529(c).

Some of these factors include "[t]reatment, other than medication, the claimant receives or has

received for relief of pain or other symptoms" and "[a]ny measures other than treatment the

claimant uses or has used to relieve pain or other symptoms . . ."  20 C.F.R. § 404.1529(c)(3)(v)-

(vi).  The ALJ may only reject claimant's testimony about severity of symptoms if ALJ gives

specific, clear and convincing reasons for rejection.   *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th

Cir. 1996) (the ALJ must give specific, clear and convincing reasons for rejecting a claimant's

subjective symptoms).

Rather than finding Mr. Wallo not disabled due to his refusal to follow treatment for his

hepatitis C, the ALJ used Mr. Wallo's refusal as a clear and convincing reason in rejecting the

credibility of his symptom.  I found this to be proper because the ALJ found that Mr. Wallo has

refused to follow treatment, other than medication, as well as any measures other than treatment

which could be used to relieve his symptom of fatigue.  (A.R. 16-17, 21, 23.)  As the ALJ noted,

the treatment that would mitigate and reduce Mr. Wallo's symptom of fatigue would be his

discontinuation of alcohol, and a change in his lifestyle, including smoking.  (A.R. 16-17, 21,

23.)  Because the limitation of fatigue is directly caused by his hepatitis C, and because treatment of his hepatitis C hinges on Mr. Wallo's discontinuation of alcohol, Mr. Wallo's refusal to stop drinking per his physicians' request is a clear and convincing reason for the ALJ to discredit the extent of his fatigue.  (A.R. 23.)

Mr. Wallo's reliance on *Swenson v. Sullivan*, 876 F.2d 683, 685 (9th Cir. 1989), does not withstand scrutiny.  In *Swenson*, the court held that the ALJ erred by failing to specify reasons for discounting claimant's testimony as to his disabling fatigue.  *Id.* at 687.  The court added that, "[t]he Secretary [of Health and Human Services]'s reasons for rejecting excess symptom testimony must be clear and convincing if medical evidence establishes an objective basis for some degree of the symptom and no evidence affirmatively suggests that the claimant was malingering."  *Id.* at 687.  Unlike the facts in *Swenson*, the ALJ used a clear and convincing reason to reject Mr. Wallo's excess symptom of fatigue.  Mr. Wallo's continuing use of alcohol prevents him from obtaining treatment for his hepatitis C, which is a direct cause of his fatigue.  Because the ALJ gave a specific, clear and convincing reason for rejecting Mr. Wallo's testimony regarding the intensity of his fatigue, the ALJ's rejection of Mr. Wallo's credibility and symptoms is thus supported by substantial evidence and not a legal error.  (Pl.'s Br. (#12) 9; A.R. 20.)

## 2.  Pain

Mr. Wallo charges that the ALJ erred in not evaluating his other pains, such as the pain related to his feet, and pain from arthritis unrelated to hepatitis C.  Mr. Wallo asserts that "the ALJ's functional limitations were that Claimant could stand and/or walk six hours out of an eight hour work day."  (Pl.'s Br. (#12) 11.)  This is an incorrect characterization of the ALJ's RFC.  The

ALJ actually stated that Mr. Wallo "is able to sit, stand and/or walk about six hours each in an

eight-hour workday." (A.R. 19.)  I interpret this to mean that Mr. Wallo is able to sit, stand, and

walk, in combination of each other, for six hours out of an eight-hour day.

### a)  Foot Pain

There is substantial evidence for the ALJ's functional limitations regarding Mr. Wallo's

foot pain.  When making determinations regarding the credibility of a claimant's subjective

allegations of pain, the ALJ takes into consideration a list of factors, including the claimant's

daily activities, the location, duration, and frequency of the claimant's pain.  20 C.F.R. §

404.1529(c).  Here, while there is evidence in the record that Mr. Wallo suffers from some foot

pain, the ALJ properly found that "his statements concerning the intensity, persistence and

limiting effects of these symptoms are not entirely credible." (A.R. 20.)

The small bone spur in Mr. Wallo's left foot and the resulting pain in his left heel are

documented in the record.  (*See, e.g.* A.R. 213, 215, 220.)  However, there is also objective

medical evidence in the record that does not support Mr. Wallo's allegations.  The ALJ has cited

to some of this contradictory evidence, such as the x-ray of Mr. Wallo's feet that revealed the

small heel spur on January 19, 2005.  (A.R. 21, 237.)  During the same visit, Dr. Richard Boughn

noted that Mr. Wallo was not tender in the region of the bone spur, but that his complaints were

more about the metatarsal heads.  (A.R. 21, 237.)  The ALJ also noted that on July 13, 2005, Mr.

Wallo told Dr. Boughn that he "has been able to continue work in his garden" and that he has

been "running a weedeater." (A.R. 22, 231.)  In addition, "[Mr. Wallo] has found some shoes are

more helpful than others and is having less discomfort." (A.R. 22, 231.)

PAGE 15 - OPINION AND ORDER

Moreover, the ALJ had a clear and convincing reason for rejecting Mr. Wallo's and his wife's testimony as to the debilitating extent of the foot pain. *Chater,* 80 F.3d at 1281. Here, the ALJ found the extent of Mr. Wallo's foot pain to be "inconsistent with his previously described daily housework." (A.R. 22.) For example, the ALJ noted that in his Function Report - Adult, completed on November 16, 2006, Mr. Wallo stated that he could walk one block and that during a normal day, he would do some laundry, clean the kitchen, fix dinner, and clean the kitchen again. (A.R. 22.) The ALJ found that despite his alleged foot problems, Mr. Wallo was able to perform these activities of daily living in addition to working in his garden and running a weedeater. (A.R. 22.)

Mr. Wallo's wife also testified at the oral hearing and the ALJ found her not to be credible, due to the inconsistencies between her testimony and that of her husband. (A.R. 23.) For example, Mrs. Wallo denied Mr. Wallo's "involvement with the strenuous physical labor related to putting up a fence in their property." (A.R. 23.) During her testimony, she stated that he did not assist much in the chain link project, but instead, supervised. (A.R. 412-13.) However, her testimony contradicted Mr. Wallo's own testimony at the oral hearing, in which he said he worked on a cement project in order to erect a chain link fence on his property with the help of his son. (A.R. 405-06.) This project involved lifting eighty to ninety pounds of cement bags, pouring, and setting fence posts. (A.R. 406.) Mr. Wallo's involvement with the cement project was also noted by Dr. Boughn in November 2005, who noted that he came in "after lifting a great deal of cement." (A.R. 23, 223.)

Because of the inconsistencies between the testimonies and evidence in regard to Mr. Wallo's foot pain, the ALJ did not err when finding Mr. Wallo's and his wife's testimonies

PAGE 16 - OPINION AND ORDER

regarding his alleged functional limitation as not credible. Therefore, I find that the ALJ's functional limitations regarding Mr. Wallo's foot pain are based on substantial evidence in the record.

### b) Joint Pain

Mr. Wallo also claims that the ALJ limited his pain to "arthralgias related to hepatitis C," and excluded pain caused by inflammatory arthritis. (Pl.'s Br. (#12) 11.) The evidence regarding Mr. Wallo's joint pain is varied, ranging from arthralgias to hepatitis C associated arthritis to inflammatory arthritis to psoriatic arthritis. (A.R. 17, 19, 21, and 23.) The most consistent of these diagnoses is his hepatitis C related arthritis. Regardless of its label variation, the functional limitations presented by joint pain were properly considered by the ALJ. He properly considered the evidence and incorporated limitations in the RFC "in consideration of his physical impairments, including. . .arthralgias." (A.R. 19.) Even if the ALJ mischaracterized Mr. Wallo's joint pain, this error is harmless because the mislabeling would not have affected the outcome of the ALJ's decision.

In January 2005, Dr. Boughn, Mr. Wallo's primary physician, diagnosed him with arthralgias, possibly related to hepatic disease. (A.R. 237, 239.) Some time in early 2005, Dr. Bough referred Mr. Wallo to Dr. Bobby Han, for a rheumatology consultation. (A.R. 236.) During his examination in April 2005, Dr. Han diagnosed Mr. Wallo with "hepatitis C associated arthritis." (A.R. 360-63.) Beginning in May 2005, it appeared that Dr. Boughn adopted Dr. Han's diagnosis, namely the "hepatitis C associated arthritis." (A.R. 235, 233, 232, 231, 223, 213, 212.) Dr. Boughn also noted that Dr. Han "[r]ecommends treatment of Hepatitis C," but "Jim has turned him down." (A.R. 235.)

PAGE 17 - OPINION AND ORDER

However, a question remained as to whether Mr. Wallo's joint pain was inflammatory arthritis (A.R. 235) or psoriatic arthritis (A.R. 231, 227, 215, 212). Dr. Blake made a note of possible psoriatic arthritis (A.R. 307.) While Dr. Boughn was in the process of determining whether Mr. Wallo had psoriatic arthritis, Dr. Boughn noted that Mr. Wallo "is aware that we are treating his pain only at this point rather than an underlying cause of his arthritis," meaning his hepatitis C. (A.R. 225.) The records are unclear as to whether Dr. Boughn ever resolved the conflict between psoriatic arthritis or hepatitis C related arthritis. Only one physician, Dr. Edward Schultheiss, concluded that Mr. Wallo had inflammatory arthritis. (A.R. 314.)

I find the ALJ's functional limitations regarding Mr. Wallo's joint pain to be based on substantial evidence. The issue in the present case is whether the ALJ properly characterized Mr. Wallo's joint pain as a symptom related to hepatitis C or inflammatory arthritis. Assuming that the diagnosis of arthralgias related to hepatitis C is correct, the ALJ did not err in finding Mr. Wallo's symptoms of joint pain as not credible. As with the symptom of fatigue, not only has Mr. Wallo declined treatment for hepatitis C, but he has also refused to stop drinking even though his physicians have told him that abstinence from alcohol would be "the single best thing" in limiting the progression of his liver disease. (A.R. 21, 235.) Because Mr. Wallo refuses to abstain from alcohol which would reduce the progression of his hepatitis C, and indirectly reduce his joint pain, the ALJ had a clear and convincing reason for finding his symptom of joint pain as not credible.

As discussed above, the ALJ also noted a discrepancy between Mr. Wallo's activities of daily living and his stated symptoms related to joint pain. Although Mr. Wallo told Dr. Boughn about having "morning stiffness, pain in knees, and pain in the epicondyl region," the ALJ found

that he "had been able to continue working in his garden and running a weedeater" later that same year.  (A.R. 22.)  The ALJ emphasized that "working in his garden and running a weedeater appear to be arduous activities, which are not expected of an individual claiming inability to work as a result of severe physical impairments."  (A.R. 22.)  Yet, the ALJ considered Mr. Wallo's joint pain in the RFC and determined that "light exertion work adequately addresses his problems with arthralgias."  (A.R. 21.)

Even if the ALJ mischaracterized Mr. Wallo's joint pain as being related to his hepatitis C, this error is harmless.  Regardless of whether Mr. Wallo experiences arthralgias, hepatitis C associated arthritis, inflammatory arthritis, or psoriatic arthritis, the end result is essentially the same—he experiences joint pain.  It is unclear why the ALJ has adopted arthralgias related to hepatitis C over the other possible diagnoses, but if this is an error, it is harmless.  *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1054-55 (9th Cir. 2006) (stating that harmless error standard applies in the Social Security context).  Where the mistake was nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion, the decision of the ALJ is affirmed.  *Id.* at 1055.

In this case, even though the ALJ limited Mr. Wallo's pain to arthralgias related to hepatitis C, it was both nonprejudicial to Mr. Wallo and irrelevant to the ALJ's ultimate disability conclusion.  There is no indication in the record that any other type of joint pain mentioned is different, or that it would cause more severe pain than arthralgias, or that the other types of joint pain would cause more functional limitations.  This terminology of Mr. Wallo's pain makes no difference as the ALJ accounted for the joint pain in his decision.  (A.R. 16, 17, 19, 21.)

**CONCLUSION**

For these reasons, the Commissioner's decision is AFFIRMED.

IT IS SO ORDERED.

Dated this __3rd__ day of March, 2009.

/s/ Michael W. Mosman_____
MICHAEL W. MOSMAN
United States District Judge